UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MIGUEL ORTIZ,

                        Petitioner,

      -vs-

SUPERINTENDENT WOODS,

                     Respondent.

_____

**DECISION AND ORDER
No. 05-CV-6499(VEB)**

## INTRODUCTION

Petitioner Miguel Ortiz ("Ortiz") filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction on November 13, 1996, in New York State Supreme Court (Monroe County) on two counts of second degree murder (felony murder and intentional murder), one count of attempted second degree murder, and one count of first degree robbery. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Ortiz was arrested, along with a man named José Santiago ("Santiago"), in connection with the robbery and shooting of Francisco Soliman ("Soliman") and his wife Mayra Soliman ("Mayra") on the afternoon of December 13, 1995, in which Mayra was fatally shot in the head. Soliman also was shot in the head, but he survived.

On the day of the shooting, Soliman was interviewed by members of the Rochester Police Department, including an officer fluent in Spanish. His wife's friend, Marilyn Guzman ("Guzman"), acted as an interpreter. Soliman told them that he had been approached by two men

outside his home who told him that this was a hold-up and that they wanted his money. T.407. Soliman initially told the police that the men ordered him into the house after he said that he did not have any money. Soliman stated that one man was someone he knew from the streets and that the other man was a total stranger to him. T.411. The following day, December 14th, Soliman told the police that he had not been truthful at first about his knowledge of the perpetrators' identities because he wanted to exact his own revenge on them. T.385-86, 406-08, 441. Soliman declared that, in fact, he did know one of his assailants, and that it was a man he knew named "Mikey." "Mikey" was the name by which Ortiz was known in the neighborhood. T.444-45. At the time, Soliman did not give any information about the other individual involved in the shooting.[1]

The trials of Ortiz and Santiago were severed. Ortiz was tried before a jury in Supreme Court (Monroe County) (Wisner, J.) from November 4 through November 13, 1996. The prosecution presented evidence that on the afternoon of December 13, 1995, Mayra Soliman was in her home on Dewey Avenue with her eighteen-month-old son. At about 2:30 p.m., while Mayra was on the phone with Tanya Rivera ("Rivera"), Ortiz arrived at her house with a couple of his friends. T.622. Ortiz happened to be Rivera's boyfriend at the time. T.619. Mayra told Rivera, "Tanya, I think your boyfriend is outside with a couple of his friends." T.622. Rivera replied, "If Richie [Soliman's nickname] is not there, don't open [the door]." *Id.* The phone call ended shortly thereafter. *Id.*

Meanwhile, at about 1:45 p.m. on December 13, 1995, Soliman had left school at the Family Center where he was studying English and stopped to run an errand on the way home. As

---

[1]     Soliman would later testify at trial that he knew the other individual alleged to have participated in the shooting as "Cholo" or "Flaco" but that on Decemeber 14th, he could not remember the name. T.428.

he pulled into the driveway to the rear of his house on Dewey Avenue, Soliman observed a male

Hispanic standing by his back door, who told him that he was with "Mikey." T.356-59. Soliman

knew Mikey (*i.e.*, Ortiz) as the boyfriend of his wife's friend, Rivera. T.360. Soliman then

knocked on the door and was let inside by Mayra; the person who was standing outside entered

the house with Soliman. T.362. Prior to the date of the robbery, Soliman had seen "Mikey" (*i.e.*,

Ortiz) about eight or nine times in the neighborhood. Ortiz also had been to dinner at Soliman's

house on two occasions with Rivera. T.361-63.

Once inside the kitchen, Soliman observed Ortiz exit the bathroom and come into the

kitchen. Soliman remained in the kitchen with Ortiz for about ten minutes before Ortiz told

Soliman that he wanted to speak with him about something upstairs. Soliman and Ortiz went to a

bedroom on the second floor and sat on the bed to talk, at which point Ortiz said that he needed a

loan. Soliman told Ortiz that he did not have any money. Ortiz announced, "This is a robbery,"

and pulled a gun from his pocket and put it to Soliman's head. T.364-65.

Ortiz continued to demand money from Soliman and, at one point, called out to the other

man to come upstairs. T.367. Mayra, carrying the baby, came upstairs with the other man. Ortiz

demanded money from Mayra, who told them that she only had three thousand dollars and

begged the men not to shoot them. In response, Ortiz remarked, "I have to, you know us." T.367.

Mayra gave the men the money she had and again begged them not to kill her and her husband.

T.368.

Not satisfied with the three thousand dollars, Ortiz demanded more money and began to

rummage through the dresser drawers. T.368-69. Soliman recalled that Ortiz threw coins at him

as he lay face down on the bed. *Id.* Shortly thereafter, Ortiz approached Soliman, who had two

pillows on his head, and shot him once in the head. T.369-71. As Soliman was lying on the bed,

in agonizing pain from being shot in the head, he heard another gunshot come from another part

of the house. T.371. Soliman waited some time before standing up and calling out for his wife;

she did not respond. Soliman managed to make his way down the staircase and out the front

door; he recalled that he was unable to see well at the time. T.371-72.

Neighbors saw Soliman staggering out of his house and toward the street, repeatedly

saying, "my wife, my baby." T.214, 236, 372. Eventually, Soliman found himself on the ground

in front of his house. T.539, 555, 793. His neighbors Onier Ramon Cabrera ("Cabrera") and Jody

Taylor ("Taylor") called 911 and stayed with him until the ambulance arrived. Soliman told

Taylor that his wife and baby were inside the house. T.794.

The ambulance arrived at about 3:02 p.m., after receiving a call that there was a drunken

man on the sidewalk. T.560. Upon his arrival, paramedic James Neary ("Neary") ascertained that

Soliman was not intoxicated but instead had suffered a head injury. T.564-65. Soliman drifted in

and out of consciousness while the paramedics attended to him, and repeatedly screamed in

concern about his wife and baby. T.565.

Officers Thomas Sawnor and Jeffrey Nobles responded to the scene and entered the

house to search for Soliman's wife and child. After searching the downstairs area, the officers

heard a baby crying on the second floor. Upstairs in a bedroom, Officer Nobles observed the

baby, covered in blood, sitting on the bed. The baby, however, was uninjured. T.575. A woman,

later identified as Mayra Soliman, was sitting on the floor with her left arm on the bed and her

head on the bed. Officer Nobles attempted to speak to her but received no response; he then lifted

her head and observed what appeared to be a bullet wound behind her right ear. Officer Nobles

could not find on a pulse. T.218-20. Mayra Soliman was pronouced dead on the scene; the cause

of death was a gunshot wound to the head. T.708.

At trial, Soliman admitted that the original story he gave to the police on the day of the

shooting was not entirely accurate, explaining that although he knew that Ortiz was one of the

two men who killed his wife and attempted to kill him, he did not tell the police this information

because he wanted to exact his own revenge on the perpetrators. T.385-86, 406-08. The day after

the robbery, Soliman told the police that, in fact, he did know his assailant, and that it was a man

he knew as "Mikey" (*i.e.*, Ortiz). T.444-45.

While still in the hospital being treated for his gunshot wound, Soliman was shown a

"six-pack" photographic array containing a picture of Ortiz, but Soliman was unable to see the

individuals in the photographs sufficiently to make an identification; he complained that his

vision was too blurry and that he would need larger photographs.[2] H.7, 19-20;[3] T.845. On

December 23, 1995, the police showed Soliman additional photographs in an 8"×10"-format.

Officer Evelyn Beaudrault ("Officer Beaudrault") stated that while viewing the first set of six

photographs, Soliman turned his face to favor the better eye and was squinting and blinking.

H.22. Soliman could not complete looking at the first set of photographs because of the

difficulties he was having with his vision. *Id.*

On January 4, 1996, the police met with Soliman at the police station and showed him

---

[2]     Dr. Howard Silberstein, a neurosurgeon from Rochester General Hospital, testified that he treated Soliman for a bullet wound to the head in December 1995. Dr. Silberstein explained that the bullet hit Soliman's skull causing a piece of the skull to break off and be projected into his brain. Surgery was not performed to remove the skull fragment. T.388-96. Dr. Silberstein testified that he expected Soliman to have permanent visual field deficits in both eyes, limiting his ability to see off to the left side with either eye. T.397. Dr. Silberstein stated that Soliman complained to him about having "blurry vision" while he was hospitalized. T.398.

[3]     Citations to "H.___" refer to the transcript of the pre-trial suppression hearing.

three sets of six photographs (all in an 8"×10"-format). H.23, 28. The first set contained a

photograph of Santiago (a/k/a "Cholo" or "Flaco"). After about forty-five seconds to a minute,

Soliman picked out Santiago's picture, and said that he "looked like . . . the guy who came in the

house when he and his wife were shot." H.25; Respondent's Exhibit D at 101. The second set of

photographs contained a photograph of Ortiz's brother, known as "Conga." Soliman did not

identify anyone in the second set. H.26-27. When shown the third set of photographs, which

contained a picture of Ortiz, Soliman identified him. H.29. Soliman told Officer Beaudrault that

the beard and mustache that Ortiz had in the photograph were "throwing him off" and so a piece

of paper was placed over the bottom portion of the photographs. H.10. Soliman stated that that

helped him identify "Mikey" (*i.e.*, Ortiz). *Id.*

Prior to opening statements, it was revealed that there was a videotape in police custody

that had been received from Soliman but that had not been disclosed during discovery.

Apparently, the videotape was given to him by some friends and contained a brief segment

filming a birthday party in 1994 attended by Ortiz. Ortiz was shown on the tape although he did

not speak. T.173. According to the prosecutor, Soliman viewed the tape "subsequent to his

having identified the Defendant from a photo array in January of [1996]." T.174. Soliman

brought the videotape to the police on February 26, 1996, the day before he testified at the grand

jury. *Id.* The property report indicated that Soliman had viewed the videotape in the presence of

the police. *Id.* at 177. The trial court held a hearing, out of the presence of the jury, on the issue

of the videotape.

Both the prosecutor and defense counsel agreed that it appeared to be Ortiz on the

videotape. T.249. The prosecutor indicated that Soliman had told Officer Beaudrault that he had

not viewed the videotape prior to bringing it to the police. T.253. The prosecutor confirmed that

the assistant district attorney who had presented the case to the grand jury did not show any

photographs to Soliman at all during the grand jury proceeding. T.263-64. The trial court

determined that it needed to hear testimony from Soliman and Officer Beaudrault in order to

ascertain whether the viewing of the videotape was an actual identification procedure. T.265.

Soliman testified at the hearing that a friend of his said "he had a video where Mikey was

in." Soliman said that by the time he learned of the videotape, he had already identified "Mikey"

because he knew him "very well." T.274. Soliman informed the court that he had viewed the

videotape before he brought it to the police. T.276. He thought that showing the police the

videotape would be "more proof" that he knew Ortiz. T.277-78, 286. Soliman admitted that he

told the police he had never seen the tape before so that they would show it to him and he could

demonstrate that he knew it was Ortiz. T.295. He admitted that this was not true. *Id.* Soliman

said that he "knew it was Mikey, because [he] ha[d] never forgotten his eyes[.]" *Id.* Officer

Beaudrault testified that she did not personally make a report of the viewing, and stated that no

one told her not to make a report. Apparently, according to the prosecutor, the previous assistant

district attorney on the case knew of the videotape but stated that he was unaware that Soliman

had ever viewed the tape.

Defense counsel requested that the prosecution be precluded from using the videotape for

any purpose but stated that he might use it in connection with the cross-examination of Soliman.

T.338. The trial court made extensive findings of fact, including findings concerning Soliman's

familiarity with Ortiz. The court concluded that Soliman's viewing of the tape with the police

was not an identification procedure as such, although the police officer's participation in the

viewing was to be condemned. However, the trial court found, it would "exalt form over substance to say that the witness could be open to police suggestion . . . when, in fact, . . . it was the witness who was the driving force behind the playing of the tape[.]" T.344. The trial court found that Soliman "basically was impervious to police suggestion" at that point, having been convinced, since January 4, 1996, that Ortiz was the assailant. T.345. The trial court denied defense counsel's motion to dismiss the indictment but granted his request to preclude the prosecution from using the videotape for any purpose. Defense counsel was given leeway to use the tape as he wished for cross-examination. T.348. The trial court reserved the defendant's right to request further sanctions or curative instructions later in the trial. *Id.*

Defense counsel strenuously attacked Soliman's credibility on cross-examination, eliciting admissions that he was a heroin dealer. T.384-87, 393-99, 404-512. Defense counsel also doggedly cross-examined Soliman with respect to his identifications of Ortiz and Santiago. Soliman repeatedly denied that other individuals from the community, such as Rivera and Garcia, had supplied him with the names "Mikey" and "Cholo" or "Flaco." T.445, 489-90, 497-99, 511. Soliman denied ever telling Officer Beaudrault and Officer D'Ambrosio that others refreshed his recollection that "Cholo" was one of the perpetrators.  T/497-99. Defense counsel also showed Soliman one of the sets of photographs he had been shown at the hospital on December 23, 1995; the series included a photograph of Ortiz as well as defense Exhibit EE, which was not a photograph of Ortiz. When asked whether "EE" was the man whom Soliman identified as "Mikey," Soliman responded, "Yes." Defense counsel asked, "[I]s this Mikey in this picture?" Soliman replied equivocally, "He's a lot like him." T.450-51. After the photograph was received into evidence, Soliman testified that he was confused and, at that point, on his own initiative,

identified "Mikey" from the series of photographs he had just been shown. T.451. Soliman insisted that he "always knew that Mike was one of them [*i.e.*, the perpetrators] and that Cholo was the other one." T.500. Soliman explained that he did not tell the police on December 14th that Cholo was involved because although "he had seen him, . . . [he] did not remember his name." *Id.*; *see also* T.498 ("I remembered the name Cholo, because I saw that face and I know that I knew that person. I did not have any conversations with anyone, because nobody knew who was Cholo or Mikey."). Defense counsel also addressed the issue of the videotape, and elicited an admission from Soliman that he had lied to the police when he said that he had not seen the tape before he brought it to them. T.453-55. Soliman maintained, however, that he did not receive the videotape until after he had identified "Mikey" from the photo array in January. T.455.

The prosecution presented several other witnesses who gave testimony that tended to place Ortiz at the crime scene. Sixteen-year-old Emilio Rodriguez ("Rodriguez") who lived across the street from the Solimans testified he observed a bright aqua-green-colored Toyota Celica parked near 685 Dewey Avenue and facing southbound at around the time of the robbery. T.518-20, 524. Rivera, Ortiz's girlfriend, identified the car as one she knew Ortiz to use at the time. T.620. Officer Jacquelyn Carroll-Norman of the Rochester Police Department testified that while on a routine traffic patrol that day, she noticed a "unique" aqua-green-colored Toyota parked near 685 Dewey Avenue at the time of the robbery. Officer John Boyan of the Irondequoit Police Department testified that, four days before the crime, he had pulled over a man who identified himself as Miguel Ortiz driving the same vehicle. T.716-17. The vehicle was towed after that traffic stop. Eric Garcia ("Garcia") testified that and he and Pauline Figueroa had sold the car to a man named "Mike" in either the first or second week of December for $900. Several

days after he sold it, Garcia saw the car again; it had markings on it, indicating that it had been towed. T.656-61.

Rodriguez testified that, at about 2:45 p.m., he saw two men come from behind 685 Dewey Avenue and get into the aqua-green Toyota. T.529-37. About five minutes later, Rodriguez saw Soliman lying next to a tree in front of 685 Dewey Avenue, his shirt covered in blood, repeating, "my kid, my wife," in Spanish.. T.538-40. Neighbors Jody Taylor and Vandella Holmes reported seeing two men in the driveway of 685 Dewey Avenue at around the time of the crime. T.790-91, 870.

Defense counsel called Officer Beaudrault and questioned her extensively about Soliman's ability to identify Santiago (a/k/a "Cholo" or "Flaco") as the second perpetrator. T.849-53. Officer Beaudrault testified that Soliman supplied the police with the nicknames "Cholo" and "Flaco"sometime after January 4, 1996, and that he said that his memory was refreshed as to Santiago's nickname by members of the community to whom he had spoken. T.849, 852. Officer Beaudrault stated that Soliman would not reveal these individuals' names or what, specifically, they had said to him. T.853-53. When questioned by the prosecutor, Officer Beaudrault testified that Soliman told her that he had known Santiago "from the streets" but that he did not know him by his proper name. T.863.

The jury returned a verdict convicting Ortiz as charged. He was sentenced on December 17, 1996, to twenty-five years to life in prison for each second degree murder conviction, those sentences to be served concurrently with each other. He was sentenced to twelve and one-half to twenty-five years for the attempted murder and robbery convictions, those sentences to be served concurrently with each other but consecutively to the sentences for the murder convictions.

Ortiz's aggregate sentence was an indeterminate term of imprisonment of thirty-seven and one-half years to life.

Following the judgment of conviction, and while preparing for the trial of co-defendant Santiago, the prosecution discovered that Soliman had not been truthful when he testified at Ortiz's trial regarding his identification of Santiago as one of the men who was involved in the crime. The prosecutor appeared in Monroe County Supreme Court (Wisner, J.) with Santiago and his counsel and explained that in preparing Soliman to testify at Santiago's trial, it appeared that Soliman was wavering as to his ability to identify Santiago independently. The prosecutor was not comfortable with Soliman's answers as to how he would respond to questions such as those asked at Ortiz's trial–namely, whether Soliman had been supplied with Santiago's name by members of the community. After speaking with Soliman, the prosecutor was of the opinion that Soliman had not been truthful at Ortiz's trial regarding his ability to independently identify Santiago. However, the prosecutor averred, Soliman had never recanted his identification of Ortiz. Because the case against Santiago essentially rested on Soliman's ability provide an eyewitness identification, which the prosecutor felt was compromised by Soliman's having spoken to people in the community, the prosecutor asked that the indictment against Santiago be dismissed. The trial court granted the request.

Following this development, Ortiz's trial counsel, David Murante, Esq., contacted the trial court and requested that counsel be assigned to Ortiz for the purposes of preparing a motion pursuant to New York Criminal Procedure Law ("C.P.L.") § 440. In March of 1997, Peter Pullano, Esq. was assigned to represent Ortiz in this regard and, on May 16, 2000, he filed a

motion to vacate the judgment pursuant to C.P.L. § 440.10(1)(f), (g) and (h)[4] alleging that

Soliman's perjury with respect to his ability to identify Santiago as one of the perpetrators was

"newly discovered evidence" warranting a new trial. Appellate counsel argued that "Soliman's

identification was at the heart of the defense." Respondent's Exhibit U at 389. He also pointed

out that "Soliman had viewed a videotape in which Mr. Ortiz appeared and had lied to the police

about the nature of that viewing." *Id.* According to counsel, "this issue–that Soliman was lying

under oath about the circumstances leading up to the identifications–would probably have

resulted in a verdict more favorable to Mr. Ortiz." *Id.*

      On December 11, 2000, the Monroe County Supreme Court (Fisher, J.) issued a lengthy

decision and order denying the C.P.L. § 440.10 motion. *See* Respondent's Exhibit W at 448-60.

As an initial matter, Justice Fisher denied Ortiz's requests for relief under § 440.10(1)(f)

(prejudicial or improper conduct) and § 440.10(1)(h) (constitutional violation), noting that Ortiz

had not alleged any improper or prejudicial conduct at trial, nor had he complained that his

conviction was obtained in violation of his constitutional rights. Thus, the court only considered

Ortiz's motion under the rubric of § 440.10(1)(g), the subsection dealing with "newly discovered

evidence"–that is, Soliman's purported recantation of his identification of Santiago as one of the

perpetrators.

      In his thorough and cogent discussion of Ortiz's claim of newly discovered evidence,

---

[4]      "At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment on the ground that: . . . (f) Improper and prejudicial conduct not appearing in the record occurred during a trial resulting in the judgment, which conduct, if it had appeared in the record, would have required a reversal of the judgment upon an appeal therefrom; or (g) New evidence has been discovered since the entry of judgment . . . which is of such character as to create a probability that had such evidence been received at trial the verdict would have been more favorable to the defendant; or (h) the judgment was obtained in violation of a right of the defendant under the constitution of this state or the United States." N.Y. Crim. Proc. Law § 440.10(1)(f) - (h).

Justice Fisher noted that, at trial, Soliman

> was repeatedly challenged during cross examination on the question [of] whether
> he had learned of codefenant Santiago's involvement only after having spoken to
> others in the community. The defense continually advanced the theory throughout
> the trial that Soliman had no independent recollection of Santiago. Soliman was
> steadfast, however, in denying that anyone assisted him in identifying Santiago as
> the man he first met in the driveway, and who came into the house with him.
>
> Defendant asserts that he discovered, after trial, that Soliman may have perjured
> himself at trial when asked specific questions regarding his identification of
> codefendant Santiago. The basis for this, however, is a proffer by the People at the
> scheduled trial of Santiago, which resulted in the dismissal of the indictment
> against Santiago. The People revealed to the court and Santiago that Soliman had
> admitted to the prosecuting Assistant District Attorney that he had in fact spoken
> to others in the community who told him that Santiago had been involved in the
> crimes. Prior to learning of Santiago's involvement from others, it appears that
> Soliman had no independent recollection of Santiago as one of the perpetrators. It
> is this key point upon which the defendant argues that, had the jury known at the
> time of trial that Soliman had no ability to independently identify Santiago as a
> codefendant, and that he was lying when asked if he had learned that information
> from others, the jury would probably have found a verdict more favorable to this
> defendant.

Order Denying First C.P.L. § 440.10 Motion at 7-8 (Respondent's Exhibit W at 454-55).  Justice

Fisher determined that "[w]hile it [was] certainly possible that this information may have had

some effect on the jury[,]" such a result was not "probable." *Id.* The following factors were

relevant to this determination:

> Soliman was repeatedly cross[-]examined about his inability to identify
> codefendant Santiago, and he continually denied being assisted by others in the
> community about that identification. Later in the trial, however, Rochester Police
> Investigator Evelyn Beaudrault testified that Soliman told her that members of the
> community did in fact assist him in remembering the name of the man whom he
> first met in the driveway, codefendant Santiago. It is also noteworthy that
> throughout cross[-]examination of Soliman, defense counsel skillfully showed
> that, prior to trial, Soliman had intentionally lied to police investigators about
> other issues at several times during their investigation.

*Id.* at 8-9 (Respondent's Exhibit W at 455-56). Furthermore, Justice Fisher found, there was "no

allegation that the People kn[e]w of the perjury at the time Soliman testified against defendant, and there [wa]s no allegation that Soliman perjured himself on the issue of defendant's involvement in the crimes charged." *Id.* at 9 (Respondent's Exhibit W at 456). The court also found it "significant" that there was no "direct evidence on the recantation on the collateral point of Santiago's identification, because the witness [Soliman] ha[d] not submitted an affidavit in support of defendant's motion." *Id.* at 10 (Respondent's Exhibit W at 457). Moreover, nothing was submitted which "contradict[ed] Soliman's testimony against [Ortiz]." *Id.* The court noted that it was "clear" that although Soliman's familiarity with Santiago may have been "fleeting at best," the same could not be said about his familiarity with Ortiz, as the trial testimony revealed "that the defendant visited the Solimans' house on two occasions for dinner." *Id.* In addition, Soliman testified that he "also knew defendant from seeing him in the community many times." *Id.* Justice Fisher observed that "[t]hroughout his testimony, Soliman was unwavering in his identification of the defendant [Ortiz] as the person who robbed and shot him, notwithstanding his uncertainty regarding codefendant Santiago's identity." *Id.*

Justice Fisher proceeded to review the other evidence adduced at trial linking Ortiz to the crime. In particular, the court pointed to the testimony offered by Soliman and Rivera regarding the two occasions on which Rivera had brought her boyfriend, Ortiz, to Soliman's house for dinner. The court also noted the evidence of the phone call between Rivera and Mayra Soliman at approximately the time of the robbery and shootings during which Rivera, upon hearing that Ortiz was outside, warned Mayra not to open the door if her husband was not home. There was also testimony that on the day after he was shot, Soliman was questioned in the hospital by police detectives, with the assistance of Mayra Soliman's friend Marilyn Guzman ("Guzman"), who

translated. Guzman advised the detectives that Soliman identified one of the assailants as a person named "Mike" and that the other man was a "stranger." *Id.* The written statement taken that date, indicating Soliman's use of the name "Mike," was shown to Guzman at trial. This was not diminished by the fact that Guzman was unable to recall at trial whether Soliman had used the name "Mike" or "Mikey" during her translation. *See id.* Finally, the court pointed to the evidence offered by, *inter alia*, Officer Carroll-Norman and Soliman's neighbor, Rodriguez, "linking defendant's distinctive automobile to the crime scene." *Id.*

Justice Fisher found that, after comparing the alleged newly discovered evidence to the trial record, it was "clear that the claimed evidence shed[ ] no new light on the case." *Id.* at 12. Furthermore, Ortiz failed to show that the new evidence "was anything other than cumulative to that which was already before the jury, or that its revelation to the jury would probably have resulted in a more favorable verdict." *Id.* (citations omitted). Finally, the court denied Ortiz's request for a hearing, finding that there were "no unusual circumstances" that persuaded the court that a hearing was necessary. Leave to appeal the denial of this C.P.L. § 440.10 motion to the Appellate Division was denied.

Following the conclusion of the litigation of the C.P.L. § 440.10 motion, appellate counsel Pullano perfected Ortiz's direct appeal. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction on November 21, 2003. *People v. Ortiz*, 1 A.D.2d 1017, 767 N.Y.S.2d 361 (App. Div. 4th Dept. 2003). Leave to appeal to the New York Court of Appeals was denied on February 6, 2004. *People v. Ortiz*, 1 N.Y.2d 632, 808 N.E.2d 1289, 777 N.Y.S.2d 30 (N.Y. 2004).

On August 18, 2004, Ortiz filed a *pro se* motion to vacate the judgment pursuant to New

York Criminal Procedure Law ("C.P.L.") § 440.10(1)(f) and (h) alleging that he was denied the effective assistance of trial counsel. In particular, Ortiz criticized counsel for failing to object promptly when the trial court failed to respond to a jury note asking to view certain exhibits until after the jury sent out a subsequent note announcing that they had reached a verdict, in violation of C.P.L. § 310.30.[5] (The piece of evidence which the jury requested in the note in question actually had not been introduced into evidence and therefore were not available for the jurors to review during their deliberations.) *See* Respondent's Exhibit J. The prosecution responded that the claim was procedurally barred under C.P.L. § 440.10(2)(c) and, in any event, was without merit. On September 13, 2004, Monroe County Supreme Court (Affronti, J.) denied Ortiz's motion for the "reasons set forth" in the prosecution's answering papers. *See* Respondent's Exhibit L. In particular, Justice Affronti noted that the issues raised in Ortiz's motion "should have been raised on his direct appeal," *see* N.Y. Crim. Proc. Law § 440.10(2)(c), and that it was "readily apparent" from the Fourth Department's order affirming the conviction that "trial counsel's alleged omission did not deprive Defendant of a fair trial or affect its outcome[.]" *Id.* (citations omitted). On April 11, 2004, leave to appeal the denial of the C.P.L. § 440.10 motion to the Appellate Division was denied.

Ortiz then filed a *pro se* motion to vacate pursuant to C.P.L. § 440.20 on June 23, 2005, arguing that his sentences were illegal and that the consecutive sentences imposed should be set aside and ordered to run concurrently. *See* Respondent's Exhibits S, T. The prosecution argued

---

[5]        Appellate counsel had raised on direct appeal a similar claim styled as one of trial court error. The Appellate Division held that inasmuch as the trial court complied in all material respects with C.P.L. § 310.30 and Ortiz was not prejudiced by any delay in the court's response; the requested document had not been admitted into evidence and thus could not have been provided to the jury, irrespective of the timing of the court's response. *People v. Ortiz, supra*.

that the offenses for which consecutive sentences were imposed constituted separate and distinct

acts, and thus consecutive sentences were authorized by the Penal Law. This motion was denied.

Ortiz then filed his federal habeas petition in this Court, raising one ground for

relief–namely, the newly discovered evidence claim based on the victim-witness' perjury that he

had raised in support of his first C.P.L. § 440.10 motion.

Respondent answered the petition and interposed the affirmative defenses of procedural

default and non-exhaustion with regard to Ortiz's claim. In particular, respondent argued that

when Ortiz raised this claim in a collateral motion, "the reviewing court determined that the

petitioner had not properly raised that claim" because the "court cited violations of New York

State Procedural Law." Respondent's Memorandum of Law at 9. According to respondent, this

"was an adequate and independent state ground, prohibiting federal habeas corpus relief." *Id.* As

an initial matter, the Court notes that a procedural default based upon an adequate and

independent state ground does not necessarily prohibit the granting of a federal habeas writ;

rather, it will preclude review of a habeas claim unless the petitioner can establish cause and

prejudice, or demonstrate a fundamental miscarriage of justice. *See Harris v. Reed*, *supra*.

The Court is unclear as to what, exactly, respondent is arguing, as he does not indicate

which sections of "New York State Procedural Law" the state court cited. In any event, there is

no such statute known as "New York State Procedural Law." The Court surmises that respondent

is referring to Justice Fisher's denial of Ortiz's first C.P.L. § 440.10 motion, which was brought

pursuant to C.P.L. § 440.10(1)(f), (g), and (h). As noted above, Justice Fisher merely determined

that the allegations raised by Ortiz stated a claim that fit best under the "newly discovered

evidence" prong of C.P.L. § 440.10(1)(g), since there were no allegations of improper conduct or

a constitutional violation. Justice Fisher then considered the merits of Ortiz's newly discovered evidence claim and, in fact, cited federal case law in his decision. Thus, in no way can Justice Fisher's decision be read either as indicating that there were "violations" of a so-called "New York State Procedural Law" or be read as relying on an adequate and independent state ground. Accordingly, respondent's assertion that this claim is procedurally barred is plainly incorrect. The Court therefore will proceed to consider Ortiz's claim on the merits.

For the reasons set forth below, the petition is dismissed.

## DISCUSSION

### Standard of Review

Under the amendments to the federal habeas statute wrought by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a Federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quotation omitted). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts."

*Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). The "unreasonable application" clause is applicable when "the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

## Merits of the Petition

### Newly Discovered Evidence of Alleged Perjury by the Victim-Witness

When Ortiz presented the claim regarding the post-trial discovery that the victim-witness did not have an independent basis for identifying Santiago as Ortiz's co-perpetrator, defense counsel framed it as one of "newly discovered evidence." In New York, the Criminal Procedure Law permits defendants to collaterally challenge their convictions on the basis that "[n]ew evidence [h]as been discovered since the entry of judgment . . . which is of such character as to create a probability that had such evidence been received at trial the verdict would have been more favorable to the defendant." N.Y. Crim. Proc. Law § 440.10(1)(g). The Supreme Court has explained that "newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain*, 372 U.S. 293, 317, 83 S. Ct. 745, 759

(1963) ("Where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing. Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus. Also, the district judge is under no obligation to grant a hearing upon a frivolous or incredible allegation of newly discovered evidence."), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *accord*, *e.g.*, *Herrera v. Collins*, 506 U.S. 390, 400, 113 S. Ct. 853, 860 (1993). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution–not to correct errors of fact." *Herrera v. Collins*, 506 U.S. at 400 (citing cases); *see also id.* at 404-05  (noting that the fundamental miscarriage of justice exception has never been extended to "freestanding claims of actual innocence is available 'only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence.'") (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 454, 106 S.Ct. 2616 2627 (1986)).

Based on this Court's review of the case law, it does not appear that the Supreme Court has ever held that the presentation of perjured by a key witness in and of itself constitutes a denial of due process, even if the testimony in question was material to the prosecutor's case. *See Herrera*, 506 U.S. at 400. In *Herrera*, the petitioner presented what he believed to be newly discovered evidence of his actual innocence–an affidavit by another individual stating that he, not Herrera, had committed the murder for which Herrera had been convicted and sentenced to death. (In his habeas petition, Herrera did not assert that the prosecutor had known of his innocence, and so did not appear to be arguing that the prosecutor had committed any misconduct.) In

rejecting the petitioner's claim, the Supreme Court noted that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an *independent constitutional violation* occurring in the course of the underlying state criminal proceeding." *Id.* (emphasis supplied). The Supreme Court determined that Herrera had not established that any constitutional violations had occurred at his trial.

At the core of the Supreme Court's discussion in *Herrera* was the principle that habeas relief is available only to remedy violations of federal constitutional law; the due process clause guarantees only a procedurally fair trial and not that the verdict will be factually "correct." *See id.* at 401-02. The Supreme Court pointed to constitutional sufficiency-of-the-evidence review and noted that the requirement was only that the record contain sufficient evidence, viewed in the light most favorable to the prosecution, to justify a rational juror in finding the defendant guilty beyond a reasonable doubt. *Id.* (citing *Jackon v. Virginia*, 443 U.S. 307 (1979)). If the evidence at a petitioner's trial was legally sufficient and passed constitutional muster under *Jackson v. Virginia*, then, as a general rule, a petitioner could not proffer newly discovered evidence of actual innocence to challenge his conviction. *See id.*[6]

*Herrera v. Collins* dealt with a claim of actual innocence; the new evidence was the affidavit submitted by another individual taking responsibility for the petitioner's crime. The present case involves a claim of witness perjury on the collateral issue of the identity of a co-defendant; the new evidence does not go directly to the issue of the petitioner's guilt or

---

[6] The majority opinion (Rehnquist, J.) and the concurring opinions (O'Connor, White, JJ.) contemplated the possibility that a petitioner could bring a stand-alone actual innocence claim when he or she faced the death penalty and the state courts did not provide any further corrective process to hear the merits of the claim. *Id.* at 417, 420-21, 429. In such a case, however, the petitioner would be required to demonstrate to the habeas court by "clear and convincing evidence" that he was in fact innocent, and not merely that he would be acquitted if the new evidence was presented at the re-trial. *Id.* at 417, 429.

innocence but rather would have been used as impeachment material to undermine the overall credibility of the witness and the victim-witness' identification of Ortiz as one of the perpetrators. Notwithstanding those differences, *Herrera* appears to be the Supreme Court precedent most apposite to the present case. *Accord Simmons v. Fisher*, No. 02 Civ.4811(SHS)(MHD), 2006 WL 2129770, at *12-13 (S.D.N.Y. July 26, 2006) ("Regardless of whether *Herrera* controls the disposition of a claim of witness perjury [where there is no allegation that the prosecutor had knowledge thereof], it represents the only Supreme Court authority that is potentially directly pertinent[.]").

Viewing Ortiz's claim of newly discovered evidence through the exacting lens of *Herrera v. Collins*, it is plain that Justice Fisher's decision was neither contrary to, nor an unreasonable application of clearly established Supreme Court case law. As noted above, the Supreme Court declared in *Herrera* that absent an independent constitutional violation at trial, a claim of newly discovered evidence does not provide a basis for habeas relief. In the instant case, Justice Fisher found that Ortiz's pleadings contained no allegations of prosecutorial misconduct, let alone that the prosecutor knew or should have known that Soliman perjured himself on the issue of his ability to independently identify co-defendant Santiago. Justice Fisher also found that Ortiz had not alleged, and the record did not illustrate any other constitutional violations at his trial. In this Court's view, that was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d)(2). In sum, it appears that Ortiz cannot establish an independent constitutional violation, which is a prerequisite for bringing a colorable claim based on newly discovered evidence, according to the Supreme Court's statements in *Herrera*. Consequently, Ortiz's his claim of newly discovered evidence based on

Soliman's alleged perjury falters. *Accord*, *e.g.*, *Simmons v. Fisher*, 2006 WL 2129770, at *12-13.

The Court notes that the Supreme Court has held that the *knowing* use of witness perjury requires vacatur of a defendant's conviction "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ; *accord Jenkins v. Artuz*, 294 F.3d 284, 293 (2d Cir. 2002). Where the testimony is "in any way relevant to the case," the *knowing* use of perjured testimony by the prosecution deprives a criminal defendant of his or her right to a fair trial. *Napue v. Illinois*, 360 U.S. 264, 269-70, 79 S. Ct. 1173, 1177 (1959) (internal quotations and citation) (emphasis supplied). In this case, there has never ben an allegation that the prosecutor knew or should have known of Soliman's alleged perjury. The Second Circuit, however, has held in the habeas context that even in the absence of the prosecutor's actual or constructive knowledge of witness perjury, newly discovered evidence of such perjury may require further due-process scrutiny in certain limited circumstances. *See Sanders v. Sullivan*, 863 F.2d 218, 222-25 (2d Cir. 1988) (*Sanders I*); *accord*, *e.g.*, *Ortega v. Duncan*, 333 F.3d 102 (2d Cir. 2003).

In *Sanders I*, the Second Circuit was presented with newly discovered evidence in the form of a recantation by a key prosecution witness, although there was no indication that the prosecutor knowingly suborned perjury from that witness at trial, or even should have known that the witness was not testifying truthfully. The *Sanders I* panel determined that the state-action element required to bring the Fourteenth Amendment's due process clause into play could be met if the petitioner demonstrated "a state's failure to act to cure a conviction founded on a credible recantation by an important and principal witness." 863 F.2d at 224 (citing *Durley v. Mayo*, 351 U.S. 277, 290-91 (1956) (Douglas, J., dissenting). The Second Circuit in *Sanders I* adopted the

narrow standard articulated in Fed. R. Crim. Proc. 33 for deciding motions for a new trial based

on newly discovered evidence, and accordingly held that habeas relief on a claim based on

perjury in the absence of prosecutorial knowledge would be warranted "'only . . . *in the most*

*extraordinary circumstances.*'" *Id.* at 225 (quoting *United States v. DiPaolo*, 835 F.2d 46, 49 (2d

Cir. 1987) (emphasis in original)).   To satisfy this exacting standard, the petitioner would have to

show that (1) a witness against him had recanted his testimony, (2) the recantation was reliable,[7]

and (3) the elimination of the perjured testimony "would 'probably' cause a result of acquittal

upon retrial." *Id.* (citing *Berry v. State of Georgia*, 10 Ga. 511 (1851)). Furthermore, the Second

Circuit indicated in *Sanders I*, the reviewing court would have to be satisfied that the proof of the

perjury could not have been discovered earlier with the exercise of due diligence. *Id.* at 226

(citing *United States v. Stofsky*, 527 F.2d 237 (2d Cir. 1975)). The Second Circuit explained, "[I]t

is our belief that the perjured testimony which will trigger a due process violation must be of an

extraordinary nature. It must leave the court with a *firm belief* that but for the perjured testimony,

the defendant *would most likely* not have been convicted." *Id.* (emphases supplied); *accord*

*Sanders v. Sullivan*, 900 F.2d 601, 606-07 (2d Cir. 1990) ("*Sanders II*").

 The vitality of *Sanders I* has been called into question by a fairly recent Second Circuit

decision, *Drake v. Portuondo*. In *Drake*, the Second Circuit observed that "[s]ince *Agur*s was

decided on the basis of actual knowledge (under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194,

10 L.Ed.2d 215 (1963)), the language providing for habeas relief where the prosecution 'should

have known' of the perjury is in the nature of dictum." 321 F.3d 338, 345 (2d Cir. 2003). The

---

[7] In determining the reliability of a recantation, the reviewing court necessarily would be required to keep in mind that any recantations are to be viewed with the "utmost suspicion [and] careful scrutiny." *Id.*

panel noted that it had "not yet considered what it takes to show that the prosecution 'should have known' it was sponsoring perjury or, among other things, whether this standard entails an exercise of due diligence." *Id.*  However, the Second Circuit "decline[d] to draw the contours of the phrase 'should have known' unless . . . presented with a case that requires [it] to do so." *Id.* The *Drake* panel observed that, in *Sanders I*, it had held that habeas corpus relief may be granted even in the absence of prosecutorial knowledge of perjury. However, the Second Circuit noted in *Drake* that the panel in *Sanders I* "explicitly relied on Justice Douglas' dissent in *Durley v. Mayo*, 351 U.S. 277, 76 S.Ct. 806, 100 L.Ed. 1178 (1956)."  *Drake*, 321 F.3d at 345, n. 2. The Second Circuit signaled that this aspect of *Sanders I* might no longer be persuasive precedent in the context of federal habeas, since "AEDPA permits [the court] to rely only on clearly established Supreme Court precedent," *i.e.*, the holdings, rather than the dicta, issued by the Supreme Court. *See id.*  The Second Circuit did not decide the petitioner Drake's perjury claim on the merits but instead remanded the case to the district court in order to further develop the record on the issue of the prosecutor's knowledge–constructive or actual–of the alleged perjury. *See id.*

Less than five months after *Drake* was decided, Second Circuit relied on *Sanders I*, in granting habeas corpus relief in a case where there was *no* allegation that the prosecutor knew or should have known a witness presented perjured testimony. *See Ortega v. Duncan*, 333 F.3d 102 (2d Cir. 2003) ("[W]e treat this case as one in which there was no prosecutorial knowledge of the perjury."). Relying upon *Sanders I*, the Second Circuit stated that "due process is violated only if the testimony was material and 'the court [is left] with a firm belief that, but for the perjured testimony, the defendant would most likely have not been convicted.'" *Id.* at 108 (citing *Sanders*

*I*). This, in turn, calls upon the reviewing court to "decide whether the jury probably would have altered its verdict if it had the opportunity to appraise the impact of newly-discovered evidence not only upon the factual elements of the government's case but also on the credibility of the government's witness." *Id.* at 109 (internal citations omitted).

It is this Court's opinion that the seemingly disparate statements in *Ortega* and *Drake* can be reconciled. In *Ortega*, the Second Circuit apparently was not considering the petition under the more deferential AEDPA review standard. The Second Circuit explained that "because the state court never adjudicated the issue of Garner's perjury and the district court reached the erroneous conclusion that Garner did not perjure himself, [it] [was] in the position in this appeal to consider the impact of Garner's perjury for the first time." In other words, because it found that there was no "adjudication on the merits" of that claim, the deferential standard set forth in AEDPA's amendments to 28 U.S.C. § 2254(d) was not triggered. *See also id.* at 106 ("As the district court recognized, the state court in this case explicitly refused to make any factual finding with respect to Garner's credibility, making the usual question of the degree of deference to accord such a finding inapplicable here.") (citing *Channer v. Brooks*, 320 F.3d 188, 195 (2d Cir. 2003) (*per curiam*) ("[W]here a state court does not resolve a question of fact, no presumption of correctness can possibly attach with respect to that issue.")). Here, on the other hand, the state court clearly issued an "adjudication on the merits" of Ortiz's perjury claim as is evidenced by Justice Fisher's lengthy discussion of the claim in his order denying the first C.P.L. § 440.10 motion. Given the presence of an "adjudication on the merits" in this case, the Court is not free to consider Ortiz's claim under a *de novo* standard, as was the Second Circuit in *Ortega*.

*Channer v. Brooks* involved a claim very similar to the claim presented here. In *Channer*,

a victim/eyewitness to the robbery alleged to have been committed by the petitioner testified on cross-examination that he had never been approached by anyone after the incident who suggested that the petitioner was involved in the crime. The witness denied that he had a brother named "Trey" or "Tred", and he further claimed that he had never been shown any photographs of individuals allegedly involved in the incident other than those shown to him by the police. 320 F.3d at 191. After trial, the witness recanted this testimony at a subsequent hearing on petitioner's case. For instance, although he testified to the contrary at trial, he actually did have a brother Trey, who had shown him a photograph of the petitioner that the petitioner had given to the brother. The state court found, based on corroborating evidence provided by the witness' brother that the witness in fact had testified falsely on these issues at trial. However, despite the finding that the witness perjured himself, the court did "not . . . believe that the underlying trial resulted in an injustice, or that the availability of this information would have led to a different result." *Id.* at 193. The state court in found that petitioner Channer had not demonstrated that the witness' "direct and identifying evidence would have been eroded by proof that he had seen other photographs before the trial, including one of an individual resembling Channer." *Id.*

The district court in *Channer*, in deciding the petitioner's habeas claim under the AEDPA review standard, focused on the second prong of 28 U.S.C. § 2254(d)–whether the state court had made an unreasonable determination of the facts at petitioner's post-conviction hearing. *See* 28 U.S.C. § 2254(d)(2). It also analyzed the claim under 28 U.S.C. § 2254(e)(1), inquiring whether the petitioner had rebutted with clear and convincing evidence the state court's factual findings. The district court concluded that the state court did not unreasonably interpret the facts when it determined that the witness' perjury as to the circumstances surrounding his viewing of

photographs prior to trial, likely did not alter the outcome of the jury trial. *Id.* at 194; *see also id.* at 195 ("'The [state court] stated that it '[did] not find [the discrepancy in Lewis' testimony] material to the issue of Channer's culpability, or to the fairness of the underlying criminal trial . . . since there was no credible evidence that either Lewis' or Jones' initial identification of Channer as one of the perpetrators was tainted.'") (citation omitted) (emphasis omitted).

On appeal, the Second Circuit observed that because the state court had adjudicated the petitioner's perjury claim on the merits, it was required to analyze the petition under the AEDPA review standard. *Id.* at 195. ("Because we conclude that the state courts effectively made findings with respect to the issues Channer raises, those findings are entitled to deference under AEDPA. We therefore review the state courts' findings only to determine whether they were unreasonable in light of the evidence presented, 28 U.S.C. § 2254(d)(2), or whether the presumption that they are correct was rebutted by 'clear and convincing' evidence, 28 U.S.C. § 2254(e)(1)."). The Second Circuit agreed with the district court that there was "ample support" for the state court's conclusion that "exposure of [the victim-witness'] perjury would not have altered the result of Channer's jury trial." *Id.* at 196. Although the witness' credibility would have been impeached and the petitioner's testimony strengthened by the revelation of perjury, both victims had made eyewitness identifications of the petitioner at trial, and testified that they had previously identified the petitioner after being shown a series of about ten photographs at the police station. There was testimony offered by the police officers that the two victims identified the petitioner separately, and neither indicated that anyone except the petitioner might have been the perpetrator. *Id.* Accordingly, the state court "reasonably determined" that the impact of the witness' perjury was "insufficiently strong to have produced a different outcome at trial." *Id.* at

196.

The petitioner in *Channer* drew the Second Circuit's attention to two cases in which it had "ordered a new trial when a critical witness had committed perjury during trial and the prosecution was presumed not to have had knowledge of the perjury." *Id.* (citing *United States v. Wallach*, 935 F.2d 445, 455-59 (2d Cir. 1991); *United States v. Seijo*, 514 F.2d 1357, 1364-65 (2d Cir. 1975)). The Second Circuit stated that even assuming, *arguendo*, that the facts of those cases were "indistinguishable," it could not grant Channer's petition on the basis of those cases because Channer's case arose under 28 U.S.C. § 2254, as amended by AEDPA, which "requires that deference be accorded to state court findings of fact, whereas *Wallach* and *Seijo* each arose as a direct appeal following a conviction in a district court." *Id.* In those cases, the Second Circuit had occasion to consider the impact in the first instance and determined that, "without the perjury, a different result at trial was probable."[8] *Id.* By contrast, AEDPA limited the Second Circuit in *Channer* to inquiring whether it was "unreasonable" for the state court to conclude that, based on the evidence presented, the trial was fair notwithstanding the perjury, and whether the petitioner had presented evidence in the district court that "clearly and convincingly" rebutted the presumption of correctness accorded to the state court's factual findings. *Id.*

Analyzing Ortiz's claim under the AEDPA review standard, as the Second Circuit did in

---

[8]       In *Ortega v. Duncan*, on the other hand, the Second Circuit found the reasoning of *Wallach* applicable, even though *Wallach* involved a direct appeal from a federal district court conviction, rather than a collateral attack on a state conviction through habeas. This was because "*Wallach* and other direct appeal cases (such as [*United States v.*] *Gallego*) required [it] to consider "the impact of witness perjury in the first instance" rather than examining a state court determination of the issue under the deferential standard set forth in 28 U.S.C. § 2254(d)." *Ortega*, 333 F.3d at 102 (citing *Channer*, 320 F.3d at 196). Because the state court never adjudicated the issue of the witness's perjury and the district court reached the erroneous conclusion that the witness did not perjure himself, the Second Circuit in *Ortega* was in the position in that appeal to consider the impact of the perjury for the first time.

*Channer v. Brooks*, the Court has no difficulty agreeing, not only with the reasonableness, but also with the correctness of Justice Fisher's conclusion that it was not probable that the outcome of the trial would have been different had the jury been given the opportunity to appraise the impact of the newly-discovered evidence of the victim-witness' perjury. Moreover, even if the Court were to analyze the claim without applying the AEDPA standard, and were to evaluate the case against the Second Circuit's precedent as forth in *Sanders v. Sullivan*, the Court would not be left "'with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Ortega v. Duncan*, 333 F.3d at 108 (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991) (quoting *Sanders I*, 863 F.2d at 226) and citing *United States v. Gallego*, 191 F.3d at 161).

The alleged perjury at issue here concerned Ortiz's ability to independently identify co-defendant Santiago as one of the perpetrators. To recapitulate, after Ortiz's conviction and on the eve of Santiago's trial, the prosecutor informed the trial court that he had learned from Ortiz that Ortiz in fact had spoken to individuals in the community prior to identifying co-defendant Santiago from a photographic array. While preparing to testify at Santiago's trial, Ortiz apparently admitted to the prosecutor that he had "heard from other people that Cholo [*i.e.*, Santiago] was supposedly one of the other people involved and was the guy outside." Respondent's Exhibit W at 430. Although the perjury bore on a collateral issue–that is, the identify of a co-defendant–it was arguably material since it went to the issue of the overall credibility of the key prosecution witness (Soliman). *See United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992) ("The credibility of a witness who testifies as to substantive facts is critical in the trial of a case."). The Court also notes that although Soliman plainly was a key part of the state's

case against Ortiz, there was other, indirect evidence, linking Ortiz to the crime. In particular, there was the evidence of Rivera's conversation with Ortiz's wife just prior to the shootings, as well as the testimony of several witnesses placing Ortiz's distinctive car at the crime scene.

However, even conceding that the perjury was material since it bore on the credibility of the key prosecution witness, Soliman, the Court doubts whether the perjury at issue here was non-cumulative given the fairly substantial evidence of other misrepresentations and lies to the police committed by Soliman. In *United States v. Gallego*, a direct review case cited by Justice Fisher in his order denying Ortiz's C.P.L. § 440.10 motion, the Second Circuit explained that a defendant moving for a new trial based on perjury must show that the perjury is "so material and non-cumulative that [it] 'probably would have resulted in an acquittal.'" *Gallego*, 191 F.3d 156, 161 (2d Cir. 1999) (citations and internal quotation marks omitted), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (quoting *United States v. Agurs*, 427 U.S. at 111 n. 19 (1976)). As Justice Fisher pointed out, defense counsel "skillfully showed that, prior to trial, Soliman had intentionally lied to police investigators about other issues at several times during their investigation." Respondent's Exhibit W at 456. In particular, Soliman admitted several times on cross-examination that he intentionally misled the police about how the crime had occurred and initially claimed that he did not know who the perpetrators were because he wanted to exact his own revenge on them. *E.g.*, T.495. There was also the issue of Soliman's pre-trial viewing of a videotape depicting Ortiz at a party. As related above, initially, Soliman claimed that he had not viewed the videotape before he brought it to the police officers. However, he later admitted that he had watched it already, although he maintained that he had not watched it prior to making his identification of Ortiz from

the photographic array. Thus, defense counsel had available, and made use of, specific instances of Soliman lying to the police about the case.  Furthermore, defense counsel elicited admissions from Soliman that he had been a heroin dealer for seven months out of the two years he had been living in New York and argued that this significantly undermined his credibility. Finally, defense counsel elicited testimony from Officer Beaudrault about how Ortiz had admitted to her during the investigation of the incident that individuals in the community had refreshed his recollection as to Santiago's nickname. Thus, the jury essentially heard the substance of what Ortiz now claims is newly discovered evidence.

All of these factors lead this Court to conclude that there was not "'a significant chance that this added item [*i.e.*, the alleged perjury regarding the victim's ability to independently identify Santiago], developed by skilled counsel . . . , could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction.'" *Petrillo*, *supra*, (quoting *Sperling*, 506 F.2d at 1333) (other quotation omitted). As noted above, defense counsel had ample impeachment material to use against Soliman, including several instances in which he intentionally lied to the police during their investigation of the crime. In this Court's opinion, those instances were more effective attacks on Soliman's credibility as a witness against Ortiz, since they dealt with his accusations against Ortiz. The instance of lying at issue here, on the other hand, did not deal with his ability to identify Ortiz. Indeed, the Court notes that Soliman was consistent in his testimony regarding his recollection of the crime. Furthermore, he was adamant that he had known Ortiz as an acquaintance prior to the shooting and that he always knew it was Ortiz who shot him. As Justice Fisher pointed out, nothing has been submitted to contradict Soliman's testimony against Ortiz. The Court has carefully reviewed Soliman's trial testimony, and, as the state court

observed, even defense counsel's relentless pounding of Soliman on cross-examination did not shake his certainty that Ortiz was the man who shot him.

After looking at all of the evidence presented against Ortiz (both pertaining to his guilt and to his credibility), the Court concludes that the state court was not only reasonable but correct in its conclusion that a different outcome was not probable, even if the jury had known that Soliman was not being truthful about whether he had been provided with Santiago's nickname by members of the community. Similarly, this Court is not persuaded that the jury in Ortiz's trial would have been sufficiently affected by the newly-discovered evidence of Soliman's perjury as to have reasonable doubt that Ortiz was involved in the shooting of Soliman and his wife. Accordingly, habeas relief is not warranted on this claim.

## CONCLUSION

For the foregoing reasons, petitioner Miguel Ortiz's request for a writ of habeas corpus is denied and the petition is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:        November 30, 2006
              Rochester, New York.

-33-